PHILLIP A. TALBERT
United States Attorney
DAVID L. GAPPA
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, Ca 93721
Telephone: (559) 497-4000

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>JATINBHAI NARESH BAKHTA,<br><br>　　　　　　　Defendant. | Case No:   1:21-CR-00023-JLT-SKO<br><br>**MEMORANDUM OF PLEA AGREEMENT UNDER RULE 11(c) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**<br><br>Date:　　November 10, 2022<br>Time:　　9:00 a.m.<br>Hon:　　Jennifer L. Thurston |

　　　　Under Rule 11(c) of the Federal Rules of Criminal Procedure, the United States of America, by and through Phillip A. Talbert, the United States Attorney for the Eastern District of California and Assistant United States Attorney David Gappa, has agreed with defendant Jatinbhai Naresh Bhakta (defendant), and his attorney, Jared Thompson, as set forth below.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative or regulatory authority.

　　　　1. <u>Charges</u>.

　　　　The defendant acknowledges that he has been charged in an indictment as follows:

　　　　Use of a Facility of Interstate Commerce in Aid of a Racketeering Enterprise and Aiding and Abetting, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2;

1

The indictment also contains a forfeiture allegation under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2. <u>Nature, Elements and Possible Defenses</u>.

The defendant has read the charge against him contained in the indictment, and that charge has been fully explained to him by his attorney. The defendant fully understands the nature and elements of the crime charged in the indictment to which he is pleading guilty, together with the possible defenses to the charge, and he has discussed them with his attorney.

The elements of the crime of Use of a Facility of Interstate Commerce in Aid of a Racketeering Enterprise and Aiding and Abetting, as alleged in the indictment, are as follows:

First, the defendant used a facility of interstate or foreign commerce;

Second, the defendant had the intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of an unlawful activity; and;

Third, the defendant performed or attempted to perform an act in furtherance of the unlawful activity;

3. <u>Agreements by the Defendant</u>.

(a) Defendant agrees that this plea agreement will be filed with the court and become a part of the record of the case.

(b) Defendant agrees to enter a plea of guilty to Use of a Facility of Interstate Commerce in Aid of a Racketeering Enterprise and Aiding and Abetting, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2, as alleged in the indictment. The defendant will also admit the forfeiture allegation in the indictment..

(c) The defendant is aware that Title 18, United States Code, Section 3742 permits a defendant to appeal his plea, conviction, forfeiture order, restitution imposed, or any sentence imposed. Acknowledging this, the defendant knowingly and voluntarily waives his constitutional and statutory rights to appeal his plea, conviction, forfeiture order, restitution imposed, or any sentence imposed, including terms of supervised release. This waiver of appeal includes, but is not limited to, an express waiver of the defendant's rights to appeal his plea, conviction, sentence (including restitution order and

terms of supervised release), or forfeiture order on any ground, including any appeal right conferred by 18 U.S.C. § 3742, except for non-waivable claims.  The defendant also agrees not to contest his plea, conviction, sentence (including restitution order and terms of supervised release) and forfeiture order in any post-conviction proceeding, including but not limited to a proceeding under 28 U.S.C. § 2255 or § 2241.  The defendant also agrees to waive his right to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statute[s] of conviction, and other pretrial motions that have been filed or could be filed.  The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statute to which the defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts included in this agreement is insufficient to support the defendant's plea of guilty.

(d)     The defendant further acknowledges that his plea of guilty is voluntary and that no force, threats, promises, or representations have been made to anybody.  Nor has any agreement been reached, other than expressly in this plea agreement, to induce the defendant to plead guilty.

(e)     The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorney's fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed under this agreement and any charges previously dismissed).

(f)     The defendant agrees that the sentencing court will consult the 2021 edition of the United States Sentencing Commission Guidelines ("USSG"), as promulgated by the Sentencing Commission under the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as modified by *United States v. Booker* and *United States v. Fanfan*, 543 U.S. 220 (2005).  The court must take them into account when determining a reasonable sentence in light of the factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the court will determine a non-binding and advisory guideline sentencing range for this case under the Sentencing Guidelines.  Defendant also understands that the court will consider whether there is a basis for variance from the guideline sentencing range

3

(either above or below the USSG range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  Defendant also understands that the court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

(g)     If the defendant's conviction, for the count to which he is pleading guilty, is ever vacated at the defendant's request, the government will have the right (1) to prosecute the defendant on the count to which he pleaded guilty, (2) and to file any new charges that would otherwise be barred by this agreement.  The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office.  By signing this agreement, the defendant agrees to waive any objections, motions, and defenses he might have to the government's decision, including Double Jeopardy.  In particular, he agrees not to raise any objections based on the passage of time with respect to a future prosecution including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

(h)     The defendant agrees not to move for any downward adjustments in his offense level under Chapter Two, Three, Four, or Five of the Sentencing Guidelines.  The defendant understands and agrees that he will not move for a downward departure of his offense level, criminal history category, or criminal history points as defined by the Sentencing Guidelines, except that the defendant is permitted to argue for what he believes to be an overall reasonable sentence under 18 U.S.C. § 3553(a).

(i)     Defendant agrees that he might be ordered to pay restitution under 18 U.S.C. § 3663, and he agrees to pay any victims the full amount of their losses as ordered by the court and as a result of the defendant's conduct as charged in the indictment.  The government will give its best estimate of the amount of any restitution that might be claimed at the time of the scheduled change of plea hearing and will advise the court and the defendant immediately of any claims that are filed.

(j)     Forfeiture:     The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title, and interest to any and all assets subject to forfeiture under 18 U.S.C. §

981(a)(1)(C), 28 U.S.C. § 2461(c), and Fed. R. Cr. P. 32.2(b).  Those assets include, but are not limited to, the following:

    a.    A money judgment in an amount determined by the sentencing court up to $1,007,600.

The defendant agrees that the listed asset constitutes or derives from proceeds traceable to a violation of 18 U.S.C. § 1952(a)(3).

The defendant agrees to pay the first $10,000 of the money judgment prior to the sentencing date for this case.  Payment should be made in the form of a cashier's check made payable to the U.S. Marshals Service and sent to the U.S. Attorney's Office, Attn: Asset Forfeiture Unit, 2500 Tulare Street, Suite 4401, Fresno, CA 93721.  Prior to the imposition of sentence, any funds delivered to the United States to satisfy the personal money judgment shall be seized and held by the U.S. Marshals Service, in its secure custody and control.

The defendant agrees to pay the remaining balance of the money judgment over 30 years (360 months) in equal monthly installments with the first installment due within the later of thirty days from sentencing or his release from custody.  The monthly payments shall continue until the full amount of the money judgment is retired.  Nothing shall preclude the defendant from pre-paying the judgment.  Payment should be made in the form of a cashier's check made payable to the U.S. Marshals Service and sent to the U.S. Attorney's Office, Attn: Asset Forfeiture Unit, 2500 Tulare Street, Suite 4401, Fresno, CA 93721.  Prior to the imposition of the sentence, any funds delivered to the United States to satisfy the personal money judgment shall be seized and held by the U.S. Marshals Service in its secure custody and control.

The defendant agrees to fully assist the government in the forfeiture of the listed asset and to take whatever steps are necessary to pass clear title to the United States.  The defendant shall not sell, transfer, convey, or otherwise dispose of any of his assets.

The defendant knowingly and voluntarily waives the notice provision of Fed. R. Crim. P. 32.2(a) and waives his right to a jury trial on the forfeiture of the above-listed asset.  The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses to the forfeiture of this asset.  The

defendant agrees to waive any jeopardy defense, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the above-listed asset by the United States, the State of California or its subdivisions.

The defendant waives oral pronouncement of forfeiture at the time of sentencing, and any defects that may pertain to the forfeiture.

4. <u>Agreements by the Government</u>.

(a) The government will recommend a three-level reduction in the computation of the defendant's offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in Section 3E1.1 of the United States Sentencing Commission Guidelines Manual and if his offense level is at least at level 16. If the offense level is below level 16, and if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in Section 3E1.1, the government will recommend a two-level reduction in the computation of the defendant's offense level.

(b) The government has not yet received any claim for restitution, but it will forward to the defense any claim that is received. For purposes of notice, the government estimates that any restitution claims received would not exceed $500,000.

(c) For purposes of notice, the government will not seek forfeiture of any property or substitute assets (in the event property subject to forfeiture is no longer owned by the defendant) in an amount greater than $1,250,000.

5. <u>Factual Basis for Guilty Pleas</u>.

The defendant will plead guilty because he is in fact guilty of the crime set forth in the indictment. Defendant also agrees that the following is a factual basis for this case, although he acknowledges that, as to other facts, the parties may disagree:

> The defendant purchased the Desert Star Motel, located at 516 S. Union Ave., Bakersfield, California in early 2015. Surveillance of the Desert Star revealed that the motel primarily catered to prostitutes and their potential clients. The Desert Star Motel was accessed directly from Union Avenue via a long driveway extending to a retractable iron gate, which appeared to be permanently left open, allowing access into the motel's parking lot. Customers would drive through this open gate, where they encountered a main office building and then several motel rooms facing north into the driveway/parking lot. Depending on the time of day, it was not unusual to see most, if not all, of the rooms' doors wide open with suspected prostitutes in lingerie standing outside, waving to drivers and approaching their vehicles. Prospective customers would park directly in front of the room of the prostitute they chose, at which time the prostitute would either direct them into the

room immediately or meet the customer outside to arrange a deal. There were approximately 20 to 25 rooms available for rent, most of which were occupied by prostitutes, with very few, if any, used for legitimate overnight residency. According to others in the motel industry, a motel room at the Desert Star and located on Union Avenue would legitimately cost between $35 and $50 per night. Defendant Bhakta often charged the people renting his rooms at the Desert Star between $100 and $200 per night.

Defendant Bhakta lived in a unit attached to the main entrance of the motel. He had two vehicles: a Silver BMW M6 with license plate 8HPE442 and a Black Toyota Tundra with license plate 71279U2, both registered in his name at the Desert Star Motel. His DMV records indicated that he had listed the Desert Star Motel as his residence. Physical surveillance of Bhakta, his vehicles, and his movements confirmed that his primary residence was he Desert Star Motel. The defendant employed Roy Drees as a handyman, and Drees lived in the same unit as Bhakta at the Desert Star Motel.

During the time that Bhakta owned the Desert Star, the majority of the business income was derived from prostitution activity that took place at the motel. The following are just some examples of law enforcement actions that took place at the Desert Star during Bhakta's ownership of the property:

On December 6, 2018, Bakersfield Police Department officers responded to the Desert Star Motel for a report of kidnapping/human trafficking in which a victim, RW, was identified, along with her pimp, Kenneth Hatley.

On December 13, 2018, James York was arrested for pimping and pandering a female in Bakersfield. A search warrant on York's Facebook private message content revealed messages from York to other pimps describing the Desert Star Motel as a "blade," a common term used by pimps and prostitutes referring to a street or location where prostitution is blatant and rampant.

On January 4, 2019, the Bakersfield Police Department conducted an undercover prostitution sting at the Desert Star Motel and arrested TS for prostitution. Investigators later determined Carlos Casteel was pimping TS out of the Desert Star Motel daily for financial gain.

On March 6, 2019, Bakersfield Police Department officers responded to the Desert Star Motel for a report of human trafficking and kidnapping. Upon arrival, officers contacted SC, the victim. Investigators determined that SC was being forced into prostitution at the Desert Star Motel by her pimp, Rayshoun Miller. Miller and another prostitute associated with him, Marshai Roberson, were subsequently arrested for kidnapping and human trafficking.

On May 16, 2019, the Bakersfield Police Department conducted a human trafficking investigation at the Desert Star Motel involving two 15-year-old girls, EN and KH (aged 16 at time of encounter with law enforcement). EN was encountered at the Desert Star Motel attempting to engage in prostitution with an undercover officer. A subsequent interview of EN revealed that she was a victim of human trafficking by her pimp, Darnell Edwards. Four cellphones were seized by the Bakersfield Police Department and EN interviewed and provided statements summarized in BPD report number 2019-101238. She stated that she saw social media posts on Snapchat from KH, who indicated that she was making a lot of money while engaging in prostitution at the Desert Star. EN stated that she saw Edwards enter the front office and speak with the owner, "Jay" Bhakta. Bhakta charged Edwards $180 for one room, for use by both minor females, for two nights. After approximately one week of prostitution activity, Edwards took the two minors to the San Francisco Bay area. The three returned after a few days, and Bhakta charged Edwards $250 for a room. The minors engaged in additional prostitution activities at the Desert Star Motel. Bhakta had a reasonable opportunity to observe that the two females were minors when they were engaging in prostitution at the Desert Star.

On June 17, 2020, the Bakersfield Police Department and two federal law enforcement agencies conducted an undercover human trafficking sting operation at the Desert Star Motel. Plain clothes BPD detectives posed as potential "johns" (the street parlance for clients in search of the services of a prostitute) and entered the Desert Star Motel separately. They were individually approached by SV, TR, and YS. Each detective separately entered the room of each female, where the following commercial sex acts were offered: SC offered a detective vaginal sex for a fee of $100; TR offered a detective "full service", which included vaginal sex and oral sex, for $50; and YS offered oral sex to a detective for a cost of $40. The women were arrested and cited for prostitution.

On October 2, 2020, BPD did an undercover human trafficking sting at the Desert Star Motel and encountered AA, a female who had been identified as being pimped by Elijah Cotton McGraw via Facebook and Snapchat search warrant returns. At approximately 0830 hours, undercover BPD detectives approached AA who was standing outside of Room #20 at the Desert Star. When they approached her, she asked if they wanted sex. When asked how much, she responded "$50." She then attempted to grab a BPD detective in his groin area. At this time, law enforcement identified themselves, and she was taken into custody.

On December 11, 2020, a 14-year-old female (AP) was found prostituting at the Desert Star. AP had been reported missing by her mother in Los Angeles County. AP was still in contact with her sister (HP), however, and AP told HP that she was making good money "tricking" in Bakersfield and that "my nigga Jamal" was looking out for her and promising to buy her a car. Law enforcement did cell tower location pings of a phone number that AP was using. BPD determined that the pings were returning to a radius close to the Desert Star Motel. Investigators knocked on doors of the motel rooms in order to locate AP. Few individuals answered their doors. During this time, AP called her sister and said she couldn't talk right then, because the cops were outside and knocking on her door. Based on these statements, BPD got a search warrant for the rooms of the motel and executed the warrant. Bhakta provided BPD keys for rooms; however, the key for Room #5 was found not to work, and the door had to be forced open. AP was recovered inside.

On December 23, 2020, a 17-year-old female (KR), who had been engaging in prostitution at the Desert Star Motel, was taken to a Bakersfield hospital by another prostitute (BC). KR had been staying in room #20, and BC along with her sister (EC) were in room #21. BC and EC had witnessed from December 22-23, 2020, a female pimp (Javonna Lewis) screaming at KR because KR, in the opinion of Lewis, had not been earning enough money and rather than "taking dates" was instead sleeping. On one occasion, LEWIS began hitting KR outside of the hotel room and pushed her, half-dressed, toward Union Ave, which is a common area for street prostitution. This altercation was recorded by Jonathon Elijah Mathrews (a pimp observed on pole camera footage various times between April 2020 and January 2021) and shared on Snapchat, which was witnessed by law enforcement later that evening. At some point in the afternoon of December 23rd, Lewis took a chair leg and assaulted KR with it. BC, who had not witnessed the assault, returned to her hotel room and saw KR standing in the parking lot, bleeding. BC asked Bhakta to assist her in getting KR to the hospital, but he said no, claiming he didn't want to get blood on his car seats. BC took KR to the hospital, at which point BPD was contacted and an investigation was initiated. BC told investigators that Bhakta would charge $140 per night if one girl was in the room or $200 if two girls shared the room. According to BC, Bhakta previously charged $120 a night, but he stated he had to make up for lost income due to being closed for a week for renovations. This closure was observed by law enforcement on pole camera recordings during the week of November 4th, 2020. BC stated that if payment was late, it would be an extra $20. Bhakta would come around every day between 10:30 am and 11:30 am to collect his money. BC said that Bhakta would lay down the rules of the motel, which included that if girls got into fights with each other, they would be kicked out for 3 months. If girls got beaten by clients or their pimps, he would do nothing as that was "part of the game." BC, who claimed not to have a pimp, stated that Mathews had tried to barge into her room and demand that she pimp for him. When BC complained to Bhakta, he

told her to "get a pimp or get a gun." She expressed concern that she couldn't escape from the room if somebody attacked her, because the back windows were barred.

All of the acts of prostitution identified above constitute violations of California Penal Code sections 266h and 266i and/or California Penal Code section 647(b) for soliciting prostitution. Bhakta facilitated the prostitution by permitting pimps and prostitutes to conduct their prostitution business at the Desert Star Motel. More specifically, he often communicated with pimps by cellular telephone and through messaging applications and often checked in on prostitutes when requested to do so by pimps.

Bhakta collected cash payments from the females who rented rooms at the Desert Star Motel each day, and he made cash deposits into bank accounts that represented the proceeds of his operation of the Desert Star Motel. During the years 2018-2020 when the business at the Desert Star was almost exclusively connected to prostitution, Bhakta made the following deposits, almost always in amounts less than $10,000, into his bank accounts:

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| January | $ 2,600.00 | $43,600.00 | $ 43,700.00 |
| February | $29,000.00 | $38,300.00 | |
| March | $ 38,500.00 | $43,600.00 | |
| April | $ 43,800.00 | $43,200.00 | |
| May | $ 46,000.00 | $ 49,000.00 | |
| June | $ 38,400.00 | $41,600.00 | |
| July | $ 40,000.00 | $38,500.00 | |
| August | $ 38,000.00 | $44,300.00 | |
| September | $ 37,000.00 | $45,600.00 | |
| October | $ 34,600.00 | $43,000.00 | |
| November | $ 39,500.00 | $41,100.00 | |
| December | $ 43,500.00 | $41,200.00 | |
|  | $ 450,900.00 | $513,000.00 | $ 43,700.00 |

**2018 - 2020 Total**           **$1,007,600.00**

The numbers above do not represent the total proceeds from Bhakta's operation of the Desert Start Motel.

6.   <u>Potential Penalties</u>.

Defendant understands that because the offenses to which he is pleading guilty were committed after November 1, 1987, the court will be required to consult the Sentencing Guidelines adopted by the United States Sentencing Commission.

The following are the potential penalties that the defendant faces:

9

Use of a Facility of Interstate Commerce in Aid of a Racketeering Enterprise and Aiding and Abetting **(**18 U.S.C. § 1952(a)(3) and 2)

(a)  Imprisonment.

> Maximum: Five (5) years.

(b)  Fine.

> Maximum: Two Hundred Fifty Thousand Dollars ($250,000) or twice the value of the pecuniary gain or loss.

(c)  Both such fine and imprisonment.

(d)  Term of Supervised Release.

> Maximum:    Three Years
>
> (Should the defendant violate any of the terms of his supervised release, he can be sentenced to prison for the remaining period of supervised release actually imposed by the court or two years, whichever is less.)

(e)  Penalty Assessments:

> Mandatory: one hundred ($100) dollars.

Dollars ($5100).

7.  <u>Waiver of Rights</u>.

The defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a)     If the defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial.  The trial could be either a jury trial or a trial by a judge sitting without a jury.  The defendant has a right to a jury trial.  But in order that the trial be conducted by a judge sitting without a jury, the defendant, the government, and the court all must agree that the trial be conducted by a judge without a jury.

(b)     If the trial were a jury trial, the jury would be composed of twelve lay persons selected at random.  The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification were shown, or without cause by exercising peremptory challenges.  The jury would have to agree unanimously before it could return a

verdict of either guilty or not guilty.  The jury would be instructed that the defendant is presumed innocent and that it could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt.

    (c)    If the trial were held before a judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of the defendant's guilt beyond a reasonable doubt.

    (d)    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against the defendant.  The defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.  In turn, the defendant could present witnesses and other evidence on his own behalf.  If the witnesses for the defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court. At trial, the defendant would also have the right to assistance of legal counsel.  If he could not afford legal counsel, an attorney would be appointed for him by the court at no expense to him.

    (e)    At a trial, the defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from this refusal to testify.

The defendant understands that by pleading guilty he is waiving all of the rights set forth above and the defendant's attorney has explained those rights to him and the consequences of his waiver of those rights.

    8.    <u>Questions by Court</u>.

The defendant understands that if the court questions him under oath, on the record and in the presence of counsel, about the offenses to which he is pleading guilty, his answers, if false, may later be used against him in a prosecution for perjury.

    9.    <u>Entire Agreement</u>.

The defendant's plea of guilty is freely and voluntarily made and not the result of force or threats or of promises apart from those set forth in this plea agreement.  There have been no representations or promises from anyone as to what sentence this court will impose.

///

10. <u>Court not a Party.</u>

It is understood by the parties that the sentencing court is neither a party to nor bound by this agreement and the sentencing judge is free to impose the maximum penalties as set forth in paragraph six (6). In making its sentencing decision, the court may take into consideration any and all facts and circumstances concerning the criminal activities of the defendant, including activities which may not have been charged in the indictment.

11. <u>Presentence Report.</u>

The defendant understands that the United States Probation Office is not a party to this agreement and will conduct an independent investigation of the defendant's activities and his background. It will then prepare a presentence report which it will submit to the court as its independent sentencing recommendation. In addition, the government will fully inform the probation office, as well as the court, of the full and true nature, scope and extent of the defendant's criminal activities, including information on his background and criminal history.

PHILLIP A. TALBERT
United States Attorney

Dated: 10/24/22      By: *[signature]*
DAVID GAPPA
Assistant U.S. Attorney

Dated: 10/18/22      *[signature]*
JATINBHAI NARESH BHAKTA
Defendant

Dated: 10-18-22      *[signature]*
JARED THOMPSON
Attorney for Defendant

12